Ruffin, J.
 

 The payment of the two bonds which fell due the 1st of January, 1856 and 1857, and were payable to, and held by Simmons, as the guardian of the plaintiff, having been been made in cash, or the notes, or bonds of other solvent persons, endorsed by the defendant, Thomas Benbury, there is no ground to impeach it, unless it be that the payment was in anticipation. That is not sufficient, of itself, to have that effect. It may often be to the interest of a ward to receiye payment of a debt before it is due. The ward may require the use of the money, or it may be a means of securing the money, or a better investment may be in contemplation. Therefore, in such a case* something more, and much more, must be shown than mere pre-payment to establish an unfair pur
 
 *399
 

 pose
 
 — mala
 
 fieles
 
 — in making it; and here there is nothing of the kind shown.
 

 In respect to the third bond, which fell due in 1858, the case goes farther towards charging the Messrs. Benbury, in alleging the payment to have been made to Simmons in a note which he had given to Thomas Benbury for a crop of wheat in July, 1855, for $3800, and that it was made in that manner, because Simmons was then in failing circumstances, and that was suspected by Benbury, which led him to adopt that plan, as the means of saving his debt. . If that case were established, it would undoubtedly entitle the plaintiff to relief on this part of the case. But it is prositively denied in the answer, and not sustained by proof; on the contrary, the evidence is the other way. It turned out that Simmons was, in October, and as far back as July, 1855, in embarrassed circumstances, and that may have been, and probably was, suspected by Benbury, before it was generally. But Simmons had a very large property, and continued in good credit up to the middle of February, 1856, when he made a general assignment. Benbury, then, could have collected his debt by attaching Simmons’ ships and cargoes in the ports of other States, or even by suits in the courts of this State, for it appears that for the balance of seven or eight hundred dollars, due on the note of Simmons, judgment was obtained in January, 1856, so as .to give it a priority over the assignment, and the money was collected. But no great stress, perhaps, ought to be laid on these circumstances, since the Court would still hold Benbury liable, if he passed Simmons’ note in payment of his own, because he suspectsd him at the time, and with the view to save himself from expense and risk, and throw them on the ward of Simmons. Although Benbury might have thought that he could save his debt, and although he might have, in fact, saved it by diligence and means in his power, yet, as he could not suppose that any such diligence or means, would have been used on behalf of the infant, he would have been justly chargeable with a concurrence in the misapplication by Simmons of the money of his ward, if, in
 
 *400
 
 truth, he made the payment of his bond in that of Simmons’ under such circumstances. The transaction would have been
 
 mala fide,
 
 and with the view to a payment, not in money, nor what was certainly money’s worth, but in doubtful paper of the guardian and trustee of the infant. The question, then, comes to this, whether the payment was intended to be in the note of Simmons, or was it in fact, in that note under the guise of being in money or the check? On that point, the answer is as precise in its denials and in its statements, as it could be framed in exculpation of the defendants, and is essentially sustained by the only proof taken. The answer states that Simmons proposed, instead of giving his own note for the price of the wheat, to pass the bond of the Messrs. Benbury in payment; that the proposition was distinctly and instantly rejected, and he was told that the two transactions would not be connected, and that the other party meant to secure and enforce payment for the wheat by attaching his vessels abroad, and that Simmons urged that such a course should not be adopted, and promised to make payment in a few days, proposing to Benbury, to that end, to leave the note with a gentleman of the bar, in Plymouth, who was the general attorney of Simmons who might receive the money; that accordingly, in September,
 
 1855,
 
 the note was thus left, but with positive instructions not to take in payment the bond held by Simmons, which fell due in January, 1858, or any thing but money, and that the gentleman afterwards informed Benbury that, in October, Simmons had paid a part of his debt in money, with which he subsequently discharged the bond of Messrs. Benbury,
 
 joro tanto.
 
 Certainly, in all that, no unfairness of purpose can be imputed to these defendants. But, it is urged, on the other side, that Messrs. Benbury are bound by the acts of their agent, and that he did not receive payment in money, but in a check drawn by Simmons, on a bank in which he had no funds, and afterwards, exchanged with Simmons the check for the bond of the other defendants, which was a mere color.— It might well be questioned whether the acts of that gentleman, who- was rather the attorney of Simmons, than of Messrs.
 
 *401
 
 Benbury, would affect the latter, when, in direct opposition to their positive instructions. But, be that as it may, and, supposing him to be the attorney of both parties, the Court does not find in the acts of that gentleman any thing to impose a liability on Messrs. Benbury. His testimony has been taken, and he affirms the truth of the answer in all its details. He states that John A. Benbury was prevailed on by him, not to harrass Simmons by attachments in other States, and was informed by him that he thought he could collect the money for him; that Mr. Benbury instructed him positively not to connect the two debts together, and to receive nothing in payment but money; that he applied to Simmons for payment, who proposed to exchange notes, and he rejected the application, and informed him of his instructions. That Simmons then said that he had not tfie money in hand, but had it to his credit in a bank at Washington, and would get it and pay it over in a few days; that he then asked Simmons whether he had the amount in bank, subject to his check, and the latter stated that he had, and that he, the witness, had no reason to doubt it, and that, thereupon, he took the check in payment as money, and delivered up to Simmons his note; that being otherwise occupied, he did not find it convenient to present the check for ten or fifteen days, and that then, meeting with Simmons, he informed him that he was authorised by Messrs. Benbury to take up their bond, aud inquired of him whether he would as soon have his own check as the money, and he replied the check was money to him, as he could draw other checks on the same fund, and, thereupon, the business was closed, by returning to Simmons the check, and receiving from him the bond of the other party. Upon this statement, it is manifest that every thing depends upon the integrity of the closing transaction. As far as the personal acts of Messrs. Benbury go, there' is no opening for an imputation against them. Nor does there seem to be any in reference to those of the gentleman who acted between the parties. His instructions were to receive money in payment.— But, in the transaction of business, payment is every day re
 
 *402
 
 ceived in checks on banks, and they are considered, to that purpose as much money as the notes of the bank on which the check is drawn — that is upon the supposition that the payment of the check is expected on presentment. The witness says, Simmons assured him the funds were in bank to meet the check, and says, further, that he believed it, and liad no reason to doubt it. That he acted in good faith in that respect, may further be inferred, from his holding the check instead of presenting it immediately. If the bank had been in the same place, the delay in the presentment might have been ■suspicious; but the parties resided in Plymouth, and the check was on a bank in 'Washington, and it may well be that it was held upon the confidence that no man of business, who had any regard for his character or credit, would draw a check without funds — fortified by the positive assurance of Simmons that the funds were in bank. In such a case, the Court is not at liberty to infer a secret, colorable ■purpose in opposition to the direct and positive statement of a respectable witness, especially, when he is the only person who can have personal knowledge of the motives of the parties, and the purpose of the transaction. It may be true, and probably is, that Simmons did not have the money in bank. But the other side was not bound to see that he had. It is sufficient if they believed he had, and acted
 
 bona fide.
 
 That they did, is a presumption authorised, first, by the usual course of business, and next, by the assertions of Simmons on the subject, and the credit which the witness says he gave to his assertion.
 

 It must be declared, therefore, that the payment of the last bond, by Messrs. Benbury, was believed and intended by them to be an actual payment in money in good faith, and, therefore, that they are not responsible over again for the bond. — - Bill dismissed with costs.
 

 Per Curiam, Decree accordingly.